UNITED STATES BANKRUPTCY COURT
DISTRICT OF NORTH DAKOTA

In Re:                                                    Bankruptcy No. 17-30061
                                                          Chapter 7
McM, Inc.,

                        Debtor.
_____/

Erik A. Ahlgren, Trustee,

                        Plaintiff,

            vs.                                           Adversary No. 17-07028

Paul D. Blomquist, *in his capacity as trustee
of the Island Lake Irrevocable Trust*,

Island Lake Irrevocable Trust,

                        Defendants.
_____/

**MEMORANDUM AND ORDER**

**I.    BACKGROUND INFORMATION AND FACTS**

On or about June 6, 2011, Debtor McM, Inc. purchased real property located in

Becker County, Minnesota, with a street address of 41106 County Rd. 126, Detroit

Lakes, Minnesota 56501 (the "Island Lake Property").[1]  In December 2017, Bankruptcy

Trustee Erik A. Ahlgren filed a Complaint against Paul D. Blomquist, in his capacity as

---

[1] The legal description of the property is:

Government Lot Five (5) or the Fractional Northwest Quarter of the
Northwest Quarter (Frac'l NW 1/4 NW 1/4) of Section Thirty (30), in
Township One Hundred Forty (140) North of Range Thirty-eight (38) West
of the Fifth Principal Meridian, Becker County, Minnesota.

Ex. A (Doc. 39).

Trustee of the Island Lake Irrevocable Trust, and the Island Lake Irrevocable Trust

("ILIT"),[2] alleging that Debtor transferred this real property and other payments to

Defendant Island Lake Irrevocable Trust within two years before it petitioned for

bankruptcy relief.  The Bankruptcy Trustee sought to avoid these transfers under 11

U.S.C. §§ 544, 548.  ILIT filed an Answer denying the Bankruptcy Trustee was entitled

to the relief he sought.

In April 2018, David G. Velde, Bankruptcy Trustee for the estate of Ronald G.

McMartin, Jr. (Bankr. Case No. 17-30558), filed a Complaint against the same

defendants, alleging Debtor McMartin transferred personal property to Defendant Island

Lake Irrevocable Trust within two years before he petitioned for bankruptcy relief.  See

Adv. Pro. No. 18-7027.  Bankruptcy Trustee Velde sought to avoid these transfers

under 11 U.S.C. §§ 544, 548.  ILIT filed an Answer denying the Bankruptcy Trustee was

entitled to the relief he sought.

After a Court-hosted mediation conference involving the parties named in this

adversary proceeding and adversary proceeding 18-7027, the parties reached an

agreement resolving the causes of action in dispute and entered into the Settlement

Agreement.  Ex. A (Doc. 39); Adv. Pro. No. 18-7027, Doc. 19.  The Settlement

Agreement provided, in pertinent part, that the Bankruptcy Trustees were authorized to

market and sell the Island Lake Property pursuant to the terms of the agreement.  Ex. A

(Doc. 39, ¶ 4).  "At closing, the Trustees [were] authorized to pay from the proceeds of

---

[2] In 2019, Blomquist resigned as Trustee.  Ex. A (Doc. 39).  Successor Trustees
Rachel McMartin and Laura Hagemeister replaced Blomquist as Trustees of the Island
Lake Irrevocable Trust.  Id.  For ease of reference, the Court will refer to both the
Trustees and the Island Lake Irrevocable Trust as "ILIT."

the sale: (i) the costs and expenses of the sale as would ordinarily be allowed under 11

U.S.C. §363(j), (ii) any valid and enforceable liens against the property, and (iii) any set-

offs pursuant to subparagraph F.  The remaining proceeds shall be distributed as

follows: (a) 25% to the Defendants, and (b) 75% to the Trustees."  Ex. A (Doc. 39, ¶

4.E.).  The parties treated personal property differently.  Specifically, the parties agreed:

> **TURNOVER OF PERSONAL PROPERTY**. The Defendants shall turnover
> to the Trustees, and the Trustees shall be entitled to sell and retain 100%
> of the proceeds from the sale of the personal property listed on Exhibit A
> hereto, and all other personal property as defined in the agreement put on
> the record between the parties with Judge Fisher. The property turned over
> [to] the Trustees, at the sole discretion of the Trustees, may be retained at
> the Island Lake Property pending a sale and may be included in a sale of
> the property. All personal property is being turned over "as is, where is".

Ex. A (Doc. 39, ¶ 3).  Exhibit A lists 9 pieces of equipment and a tool carrier.  Ex.

A (Doc. 39 at 10-12).  "All other personal property" is not defined in the

agreement, but Bankruptcy Trustee Ahlgren testified that, at the close of

mediation, the parties agreed personal property would include "decorations, the

pool table, all those kinds of things other than essentially clothes and personal

nick-knacks."  Ex. O (Doc. 71 at 4).[3]

---

[3] Bankruptcy Trustee Ahlgren testified:

When describing the agreement, Judge Fisher stated that "100% of the
property on the bill of sale largely consisting of . . .  some antique or valuable
tractors – 100% will be sold and 100% of the proceeds will go to the estate
after costs . . . the other personal property items will also be 100% to the
estate which include the dock, furniture and fixtures but not including
personal items such as nick-knacks and clothes that belong to individuals
that have used the house."  In putting the outline of the parties' agreement
on the record, Trustee Ahlgren agreed with Judge Fisher's rendition of the
terms but emphasized that the personal property would include
"decorations, the pool table, all of those kinds of things other than
essentially clothes and personal nick-knacks."  All of the parties agreed that

Bankruptcy Trustees Ahlgren and Velde sought approval of the Settlement Agreement; BMO Harris Bank, N.A., objected. After a hearing on the objection, the Court approved the Settlement Agreement. Ex. A (Docs. 51-53); Adv. Pro. No. 18-7027, Docs. 31-33.

Several weeks after the Court approved the Settlement Agreement, the parties executed a stipulation to dismiss the adversary proceedings with prejudice. The Court entered an order and judgment dismissing the adversary proceedings and closed these cases.

Pursuant to the terms of the Settlement Agreement and with Court approval, the Bankruptcy Trustees retained Leslie Flugstand and Amy Nathe of Century 21 Vista, Inc. to sell the Island Lake Property. Doc. 69, ¶ 2. On June 10, 2019, Adam and Angela Jackson presented an offer to purchase the Island Lake Property for $1,300,000. Id. at ¶ 3. Two days later, the Bankruptcy Trustees counteroffered with two modifications: (a) they changed the form of deed from a warranty deed to a trustee's deed, and (b) they added an "Addendum to Purchase Agreement Relating to 41106 County Road 126, Detroit Lakes, MN," clarifying that the Purchase Agreement was contingent upon the Bankruptcy Trustees receiving a final order approving the agreement and requiring an allocation of personal property items to be included in the purchase. Id. at ¶ 4; Ex. E. The "Allocation of Purchase Price" clause provides: "Prior to closing, the Buyer and Seller shall identify the items of personal property included within the sale and agree on

_____

the outline put on the record was an accurate description of the parties' agreement.

Ex. O (Doc. 72 at 4).

an allocation of the purchase price between the real and personal property included in the sale." Ex. E. Angela Jackson accepted the counteroffer on June 12, 2019. Doc. 69, ¶ 5. Adam Jackson accepted the counteroffer on June 13, 2019. Id. According to Bankruptcy Trustee Ahlgren and Angela Jackson, the Jacksons purchased a "fully outfitted," "as is" property, including real estate and all personal property except those items specifically excluded. [4]

After deducting taxes, costs of sale and payment to the mortgage lien holder, the net sale proceeds (as reflected on the ALTA Settlement Statement) totaled $444,870.38. Doc. 69, Ex. I. Real estate commissions, recording fees and deed taxes appear to be calculated based on $1,300,000.

Shortly after the Jacksons accepted the counteroffer, Bankruptcy Trustee Ahlgren requested that Jason Ziegler, the Jacksons' realtor, ask the Jacksons to compile an inventory and assign a value to the personal property they purchased with the Island Lake Property. Doc. 69, ¶ 6. "Trustee Ahlgren asked that the valuation be based on the Jacksons' expected replacement cost in part because there were on-going disputes as to whether the McMartins would be allowed to remove certain pieces of the personal property." Id. Angela Jackson compiled the inventory and valued the personal

---

[4] The Purchase Agreement lists personal property to be included in the sale. Doc. 69, Ex. E, lines 454-59. This list includes some, but not all, of the items on the inventory prepared by Angela Jackson. The Purchase Agreement does not allocate the purchase price of the personal and real property. Id.; Ex. E. Likewise, the ALTA Settlement Statement and Closing Disclosure list the sale price of the property but do not allocate the purchase price between the personal property and real property. Doc. 69, ¶ 13; see Ex. I. Bankruptcy Trustee Ahlgren signed the Purchase Agreement, but the Bankruptcy Trustees did not sign the settlement statement or disclosure.

property based on replacement cost.  Id. at ¶ 7; see Ex. J.  The assigned values totaled $110,750.  Ex. J.

Bankruptcy Trustee Ahlgren reviewed the valuation, spot checked a few items based on internet searches and recommended to Bankruptcy Trustee Velde that they accept the valuation.  Ex. O (Doc. 71).  The Bankruptcy Trustees "accepted" Jackson's proposed valuation and included it in the motion to sell the real estate and personal property filed on June 19, 2019.  Doc. 69, ¶ 8; see Exhibit F at 9.  ILIT objected to the Bankruptcy Trustees' motion to sell the real estate and personal property, arguing that the Bankruptcy Trustees' motion included personal property that the Bankruptcy Trustees were not authorized to sell and that the Bankruptcy Trustees' allocation of $110,750 to the personal property was improper.  Doc. 69, ¶ 9.  With regard to the improper value allocation, ILIT claimed that the values assigned to the personal property were "grossly disproportionate" to the actual values and improperly circumvented the Settlement Agreement by attributing a high value to certain personal property which had already been included in the purchase price.  Bankr. Case No. 17-30061, Doc. 631.  ILIT argued that by treating these high value items as personal property rather than real property, the Bankruptcy Trustees inappropriately reduced ILIT's share of sale proceeds under the Settlement Agreement.  See id.

On July 22, 2019, the Bankruptcy Trustees and ILIT entered into a stipulation in which the parties agreed that the personal property listed on Jackson's inventory would be included with the sale of the Island Lake Property except for a number of items the parties agreed the Bankruptcy Trustees were not authorized to sell to the Jacksons.  Doc. 69, ¶10; Ex. G.  In the proposed order authorizing the Bankruptcy Trustees to sell

real estate and personal property attached to the stipulation, the parties reserved the personal property allocation issue.  See Ex. G.

On July 23, 2019, the Court granted the Bankruptcy Trustees' motion to sell the Island Lake Property and the personal property listed on Jackson's inventory as modified by the parties' stipulation.  Doc. 69, ¶11; Ex. H.  In its order, the Court clarified that it did not determine whether the Bankruptcy Trustees appropriately allocated a portion of the purchase price to the personal property listed in the motion.  Ex. H. Specifically, it stated:

> Please be advised that this Order does not represent a determination of (i) whether the Trustees appropriately allocated a portion of the purchase price to the personal property, or (ii) the competing rights of the bankruptcy estates and BMO Harris Bank N.A. (the "Bank") in and to the sale proceeds based on the Bank's asserted security interest in the personal property sold along with the Island Lake Property.

Id.

To compensate the Jacksons for certain items that that they believed were properly included in the sale, the Bankruptcy Trustees agreed to reimburse the Jacksons the retail value of the four items totaling $3,850.  Doc. 69, ¶ 12.

Over eight months after the Court closed the adversary proceedings, the parties asserted that "allocation of funds and the value of the property from the sale of the Island Lake property are still at issue in the matter," and requested a hearing on this issue.  Doc. 59.  Pursuant to their request, the Court issued a scheduling and discovery order and scheduled a hearing.  In its scheduling order, the Court observed that "[n]either party filed a pleading seeking the relief requested. Without such a pleading the issue is not ripe for review. Nevertheless, the Court reserved a hearing date and set the following deadlines in anticipation of such pleading.  If the parties fail to file the

7

pleadings listed in items 1 and 2 in the time allowed, the Court will release the hearing date."  Doc. 60.

Approximately two weeks later, ILIT filed a Motion to Enforce Terms of the Settlement Agreement Entered Into With Trustee."  Doc. 61.   ILIT asserts that the personal property listed in Jackson's inventory was included in the $1,300,000 sale price.  ILIT explained that the Bankruptcy Trustees accepted Jackson's $110,750 valuation of this property and inappropriately reduced the Island Lake Property sale proceeds by this sum before calculating ILIT's 25% share of real property sale proceeds.  Id. at 4.  It claims that deducting the $110,750 from net sale proceeds "represents a decrease in the ILIT's prorated share of the sale proceeds of $27,723.64." Id.

On May 18, 2020, Bankruptcy Trustee Ahlgren objected to ILIT's motion.[5]  He argues that the Settlement Agreement granted the Bankruptcy Trustees the authority to include a provision in the Purchase Agreement between the bankruptcy estate and the Jacksons requiring that the buyer and seller agree to an allocation of the purchase price between the real and personal property included in the sale.  The Bankruptcy Trustees maintain that they accepted the $110,750 personal property allocation prepared by

---

[5] As between Bankruptcy Trustee Ahlgren and Bankruptcy Trustee Velde, Bankruptcy Trustee Ahlgren assumed primary responsibility for "negotiating the Settlement Agreement with the Defendants in the above captioned adversary proceeding, the Purchase Agreement relating to the Island Lake Property, the allocation of the purchase price between real and personal property, and all other transactions described in the Stipulation of Facts and Exhibits filed as Doc. 69 in the above captioned adversary proceeding."  Ex. O (Doc. 71 at 2).  Bankruptcy Trustee Ahlgren also testified that he entered into the transactions with the consent of Bankruptcy Trustee Velde and he consulted with Bankruptcy Trustee Velde as necessary in entering these transactions.  Id.

Jackson pursuant to the Purchase Agreement and argue that ILIT is bound by this figure for purposes of calculating ILIT's and the bankruptcy estate's shares of the sale proceeds under the Settlement Agreement.

After a short discovery period, the parties tried these issues to the Court. At the hearing, the Court received the detailed inventory prepared by Jackson and her testimony in support of it. See Ex. J; Jackson Test. She explained that she valued the property based on its replacement cost, using retail prices for the more expensive items and garage sale prices for miscellaneous items.

ILIT offered the testimony of Laura McMartin, one of the Successor Trustees, who explained that ILIT objected to the valuation assigned by Jackson because Jackson prepared it after the sale, the numbers were "arbitrary" and the values represented retail value for new items, even though the items the Jacksons purchased were "loved and used" for many years. Laura McMartin described many of the items purchased and offered an alternative "garage sale" value based on her understanding of the purchase price together with information about the local market for similar items in used condition. She testified that she disagreed with all the values listed on the inventory but, in the interest of time and to save legal fees, did not offer an alternative value for the lower-priced items.[6]

## II.   ANALYSIS

Although the parties dispute the allocation of Island Lake Property sale proceeds based on contradicting views of personal property value, they agree that the Settlement

---

[6] Debtor McMartin also testified about the value and condition of several personal property items included in Jackson's inventory.

9

Agreement governs the outcome of this dispute and ask the Court to interpret it. The

Settlement Agreement provides that Minnesota law governs the interpretation and

enforcement of the agreement.[7]  Under Minnesota law:

> A settlement agreement is a contract and it is interpreted in accordance with contract law. "The objective of judicial interpretation of disputed provisions of a contract is to ascertain and give effect to the parties' intention." Midway Ctr. Assocs. v. Midway Ctr., Inc., 306 Minn. 352, 237 N.W.2d 76, 78 (1975). Courts may ascertain the parties' intent "upon consideration of the agreement as a whole and the plain meaning of the language used, viewed in the light of the surrounding circumstances, endeavoring to arrive at what the parties must have reasonably contemplated." Id.; see also State ex rel. Humphrey v. Philip Morris USA, Inc., 713 N.W.2d 350, 355 (Minn. 2006) ("Unambiguous language in the settlement agreement is to be given its plain and ordinary meaning .... In construing ambiguous contract language, we consider the contract as a whole in light of the circumstances surrounding its formation, and strive to arrive at the parties' real understanding."). Where the language of a contract is ambiguous, meaning it is reasonably susceptible of more than one meaning, extrinsic evidence may be used to interpret that language. Housing & Redevel. Auth. v. Norman, 696 N.W.2d 329, 337 (Minn. 2005).

Insignia Sys., Inc. v. News Corp., 2020 WL 1678052, at *3 (D. Minn. Mar. 17, 2020), R

& R adopted, 2020 WL 1678263 (D. Minn. Apr. 6, 2020).  At the hearing, the parties

agreed that the plain language of the Settlement Agreement was ambiguous and

---

[7] ILTA asserts that the standard the Court should apply to this proceeding is the same standard applied to the review of bankruptcy estate property sales.  The Eighth Circuit Bankruptcy Appellate Panel summarized this standard as follows:  "'A sale of estate property outside the ordinary course of business is in the best interest of the estate and may be approved if it is for a fair and reasonable price and in good faith.'" VanCura v. Hanrahan (In re Meill), 441 B.R. 610, 615 (B.A.P. 8th Cir. 2010) (internal citation omitted).  The Court applied this standard and approved the sale of the Island Lake Property on July 23, 2019.  Ex. H.  It found that $1,300,000 was a fair and reasonable price for both personal property and real property and concluded that the sale was in the best interests of the bankruptcy estate.  Id.  Regardless of the outcome of this matter, the Court's ruling regarding the sale will stand.  The Court is not convinced that the section 363 standard is the appropriate standard to apply in this context where the Court has already ruled on the terms of the sale and it is now requested to review a settlement agreement, the intent of the parties to that agreement and the circumstances related to enforcement of it.

requested that the Court consider extrinsic evidence showing their intent.  Accordingly, the Court received evidence beyond the four corners of the Settlement Agreement and considered it in reaching its conclusions.

### A.    ILIT's claim that no value should be allocated to the personal property sold to the Jacksons for purposes of determining its share of the Island Lake Property sale proceeds is rejected.

ILIT asserts that the personal property sold to the Jacksons was included in the sale price for the real estate under the Purchase Agreement, and no separate value should be assigned to it.  In support of this argument, ILIT explained that the Jacksons paid $1,300,000 for the real estate and specific items generally included in the sale of residential structures; all other personal properly listed in the Purchase Agreement and included in the inventory prepared by Jackson was "gratuitous."  Doc. 74; oral arg. More specifically, ILIT claims that, if the Bankruptcy Trustees sold personal property that is typically not included in the sale of residential real property, they should have charged an additional price for these items.   Applying this theory, failure to charge for the personal property suggests that the value to the buyers was zero.  ILIT also maintains that the Court should not consider the value the Bankruptcy Trustees seek to attach to personal property because this value was not considered during the sale process:  the Listing Contract does not refer to personal property; the Bankruptcy Trustees did not seek Court approval to retain professionals to sell personal property;[8] and real estate commissions, deed taxes and recording fees were based on the full price of $1,300,000 rather than $1,300,000 less the value of personal property.

---

[8] See Ex. B, Bankr. Case No. 17-30061, Doc. 592.

While the representations the Bankruptcy Trustees made to potential purchasers, real estate agents and taxing authorities is relevant, these brush strokes do not paint a full picture.  During settlement negotiations, which took place prior to the Bankruptcy Trustees' listing agreement with real estate agents and the sale, the parties discussed many of the personal property items at issue and negotiated the sale proceeds split ultimately incorporated into the Settlement Agreement.  Based on the language of the Settlement Agreement and Bankruptcy Trustee Ahlgren's testimony summarizing the parties' agreement, it is apparent the parties contemplated that the personal property the estate planned to sell had value separate from the real estate.  Likewise, it is apparent that the Bankruptcy Trustees and the Jacksons attributed value to the personal property when the Jacksons demanded a "fully outfitted," "as is" property and when the parties listed personal property items in the Purchase Agreement.  The Bankruptcy Trustees and the Jacksons also contemplated a separate value for the personal property included in the sale when the Bankruptcy Trustees proposed, and the Jacksons accepted, the addendum requiring the buyers and sellers to agree to the value of these items.  The Bankruptcy Trustees included Jackson's inventory and appraisal in their motion seeking approval of the sale and the stipulation resolving the motion, presumably in an attempt to be transparent about this claim.  Viewing surrounding circumstances and endeavoring to arrive at what the parties must have reasonably contemplated, the Court finds that the parties to the Settlement Agreement understood that the bankruptcy estate would recover a monetary sum for the personal property.  See generally, Insignia Sys., Inc., 2020 WL 1678052, at *3.  ILIT's assertion that the value attributed to personal property sold to the Jacksons should be zero for

purposes of determining the real estate proceeds/personal property proceeds split under the Settlement Agreement is rejected.

> ### B. The Bankruptcy Trustees' claim that the value assigned to the personal property under the terms of the Purchase Agreement should govern the parties' share of sale proceeds under the Settlement Agreement is rejected.

Bankruptcy Trustee Ahlgren argues that the Bankruptcy Trustees were granted "sole authority to … negotiate the terms of any real estate sales contract" under the terms of the Settlement Agreement.  Doc. 63 at 2.  He maintains it was within the Bankruptcy Trustees' discretion to add an addendum to the Purchase Agreement requiring the buyers and sellers to allocate the sum paid for real property and personal property, and claims he was entitled to rely on this allocation when calculating the Island Lake Property sale proceeds split under the Settlement Agreement.  He suggests that the standard that should apply to these decisions is the duty of good faith and fair dealing implied as part of every contract and the business judgment standard applied under bankruptcy law.  Doc. 63 at 5 (citing U.S. v. Basin Elec. Power Coop., 248 F.3d 781, 796 (8th Cir. 2001) (applying federal common law).[9]  Bankruptcy Trustee Ahlgren asserts that the Bankruptcy Trustees, "using their collective judgment and experience, believed that the valuation used for personal property was made in good faith and fair exercise of their collective judgment."  Doc. 63 at 6.  He also argues that "the Trustees have worked diligently to exercise their judgment in a manner well within the parameters

---

[9] Minnesota law governs enforcement of the Settlement Agreement.  "Under Minnesota law, all contracts include an implied covenant of good faith and fair dealing." Green v. Bayview Loan Servicing, Inc., 2020 WL 3491668, at *5 (D. Minn. June 12, 2020), R & R adopted, 2020 WL 3491896 (D. Minn. June 26, 2020) (citations omitted). ILIT has not alleged that the Bankruptcy Trustees breached the implied covenant of good faith and fair dealing. Consequently, it is not necessary to analyze this issue.

of their obligations under the Settlement Agreement and the Bankruptcy Code

mandated business judgment rule." Id. at 7.

Bankruptcy Trustee Ahlgren correctly observes that the Settlement Agreement

granted him authority to negotiate the terms of any real estate contract. He suggests

that adding an addendum to the Purchase Agreement to require the Bankruptcy

Trustees and the Jacksons to identify personal property included within the sale and to

agree on an allocation of the purchase price between the real and personal property is a

"term" of the Purchase Agreement. He maintains that fulfillment of this term binds ILIT

to the sums allocated by the parties to the Purchase Agreement for purposes of sharing

the proceeds of the Island Lake Property sale pursuant to the Settlement Agreement.

This argument raises three concerns. First, relying on a personal property

valuation prepared by the buyer after the parties to the Purchase Agreement negotiated

an "as is" deal is artificially assigning a value to the personal property.[10] The Jacksons

proposed to pay an "as is" price of $1,300,000 for the "fully outfitted property," and

therefore, had no stake in the market value of the individual pieces of personal property.

As between the Bankruptcy Trustees and the Jacksons, the Bankruptcy Trustees

concluded that an aggregate price of $1,300,000 was fair and had no incentive to

demand additional funds for the personal property not typically sold with residential

property. To the contrary, they had enormous incentive to promptly complete the sale

and to avoid troubling the Jacksons with any details that might prompt them to revoke

---

[10] This concern does not mean that the sale of all personal property was
"gratuitous" as the ILIT suggests. It means that the replacement value assigned by
Jackson and accepted by the Bankruptcy Trustees does not necessarily represent the
price the Jacksons paid for the property.

their offer.  Valuation of the personal property came after the Bankruptcy Trustees and the Jacksons had agreed to a price for all the property.  There is no way to know whether the values assigned to the personal property are a true reflection of the sum the Jacksons or another willing buyer would pay for it.

Second, the Bankruptcy Trustees' instructions to the Jacksons to base this valuation on replacement value was not a negotiated "term" of the Purchase Agreement.

Third, the Bankruptcy Trustees relied on Jackson's valuation to calculate the sale proceeds split under the Settlement Agreement without the consent of ILIT.  This valuation process, which directly affected the sale proceeds split, was not part of the Settlement Agreement, and may not be shoehorned into it through creative maneuvering.  The Bankruptcy Trustees' argument that the Settlement Agreement granted them unilateral authority to select the appraiser and valuation method is rejected.

The next question is whether Jackson's personal property valuation fairly reflects the intent of the parties to the Settlement Agreement, who agreed to split the Island Lake Property sale proceeds based on an allocation between real and personal property values.  The Court is troubled by the Bankruptcy Trustees' decisions to request that Jackson use replacement value as the valuation method, to accept Jackson's valuation—in which she estimated the value of <u>similar</u> new high-dollar items at <u>retail cost</u>—and then to apply her valuation in splitting Island Lake Property sale proceeds. This is troubling because the Bankruptcy Trustees did not consider the value of the <u>used</u> personal property items <u>actually</u> sold to the Jacksons at the time of the sale or

15

even similar used items.  By adopting Jackson's assessment of retail replacement value

as the valuation method for used appliances, furniture, equipment and other high-priced

items commonly found in a lake home, the Bankruptcy Trustees unfairly maximized the

estate's recovery under the Settlement Agreement with ILIT.  While maximizing the

estate's recovery is consistent with the business judgment rule properly applied to the

Bankruptcy Trustees' decision to recommend the sale of the Island Lake Property, it

does not fairly reflect what the parties to the Settlement Agreement must have

reasonably contemplated when they agreed to share sale proceeds based on a

personal property/real property allocation as outlined in the Settlement Agreement.  See

generally, Insignia Sys., Inc., 2020 WL 1678052, at *3.

The fact that the Bankruptcy Trustees agreed to reimburse the Jacksons a total

of $3,850 to replace four items the McMartins claimed after the sale neither supports

nor detracts from their valuation choice.  It simply demonstrates that the Bankruptcy

Trustees took steps to ensure the sale was consummated.

**C.  The value of the personal property which shall govern the parties'
shares of sale proceeds under the Settlement Agreement is the value
supported by the evidence received at the hearing.**

Other than the Settlement Agreement language they cited, the Bankruptcy

Trustees offered no authority for the valuation standard or method they selected.

Likewise, ILIT offered no authority for disputing this method or applying an alternative

valuation standard in this context.  Consequently, the Court is compelled to consider the

item-by-item evidence and argument offered at the hearing.  Based on the evidence

received at the hearing, including the testimony of Angela Jackson and Laura McMartin,

the Court concludes that the value of the personal property the estate sold to the

Jacksons totals $51,326.  <u>See</u> chart attached.  The parties shall apply this personal property valuation to the formula defined in the Settlement Agreement and split the sale proceeds of the Island Lake Property accordingly.

**III.    CONCLUSION**

The Court considered all other arguments and deems them to be without merit or unnecessary to discuss. For the reasons stated above, ILIT's Motion to Enforce Terms of the Settlement Agreement Entered Into With Trustee is granted in part as outlined in section II.C. above.

Dated:  October 19, 2020.

SHON HASTINGS, JUDGE
UNITED STATES BANKRUPTCY COURT

| Location | Jackson's Value | ILIT Testimony | Court's Finding |
|---|---|---|---|
| | | | |
| House | $8,965.00 | | $6,390.00 |
| Guest House | $4,945.00 | | $3,695.00 |
| Bar | $49,760.00 | | $17,643.00 |
| Building | $23,395.00 | | $10,429.00 |
| Outdoor | $23,685.00 | | $13,169.00 |
| Total | $110,750.00 | | $51,326.00 |

| Item | Jackson's Value | ILIT Testimony | Court's Finding |
|---|---|---|---|
| | | | |
| Living/Dining | | | |
| TV-LG | $500.00 | | $500.00 |
| L-shaped fabric sofa | $750.00 | | $750.00 |
| 1 Shaker style Leather/wood recliner | $500.00 | | $500.00 |
| Large leaf themed rug | $150.00 | | $150.00 |
| Small entry rug | $100.00 | | $100.00 |
| 2 end tables | $200.00 | | $200.00 |
| TV Stand | $200.00 | | $200.00 |
| coffee table | $200.00 | | $200.00 |
| 1 lamp | $100.00 | | $100.00 |
| Misc. Décor | $300.00 | | $300.00 |
| Dining Table @ 4 chairs | $500.00 | | $500.00 |
| | | | |
| Kitchen | | | |
| Stove with two door oven | $1,200.00 | $150-$250 (used) | $200.00 |
| Microwave | $250.00 | | $250.00 |
| French door Fridge/Freezer | $1,000.00 | $250-$500 (used) $750 (new) | $375.00 |
| Dishwasher | $1,000.00 | $50 (used), $500 (new) | $50.00 |
| Knife Set - Wusthof | $200.00 | | $200.00 |
| Toaster – Cuisinart | $60.00 | | $60.00 |
| Dyson Ball Vacuum Cleaner | $400.00 | | $400.00 |
| | | | |
| Bedroom | | | |
| Metal Frame Twin Bed | $200.00 | | $200.00 |
| Small Dresser | $200.00 | | $200.00 |
| Lamp | $100.00 | | $100.00 |
| Misc. Décor | $70.00 | | $70.00 |
| | | | |

18

| | | | |
|---|---|---|---|
| Bathroom | | | |
| Nothing of Material Value | $0.00 | | |
| | | | |
| Loft | | | |
| Queen Metal Frame Bed | $300.00 | | $300.00 |
| Dresser | $200.00 | | $200.00 |
| Side Table | $100.00 | | $100.00 |
| Lantern | $10.00 | | $10.00 |
| | | | |
| 1/2 Bathroom | | | |
| Metal Wall Art | $25.00 | | $25.00 |
| | | | |
| Crawl Space | | | |
| Heater | $150.00 | | $150.00 |
| | | | |
| **Subtotal of All Property** | **$8,965.00** | | **$6,390.00** |

| Item | Jackson's Value | ILIT Testimony | Court's Finding |
|---|---|---|---|
| Main Living | | | |
| Sofa | $250.00 | | $250.00 |
| Roll Top Desk & Roll Chair | $0.00 | | $0.00 |
| 2 End Tables | $100.00 | | $100.00 |
| Mirror | $100.00 | | $100.00 |
| Clock | $75.00 | | $75.00 |
| 3 woven rugs | $75.00 | | $75.00 |
| | | | |
| Kitchen | | | |
| Microwave - Maytag | $100.00 | | $100.00 |
| Fridge/Freezer | $0.00 | | $0.00 |
| | | | |
| Bedroom | | | |
| Wood Framed Queen Bed | $1,000.00 | $50-$150 (used) | $50.00 |
| Wood Chifforobe | $1,000.00 | $700 (new in 2010 or 2011), no used value suggested | $700.00 |
| Mirror | $100.00 | | $100.00 |
| TV Stand | $200.00 | | $200.00 |
| 2 End Table | $200.00 | | $200.00 |
| 2 Lamps | $150.00 | | $150.00 |
| TV - Sharper/LG | $450.00 | | $450.00 |

| Island Lake Themed Photo | $25.00 | | $25.00 |
|---|---|---|---|
| Misc. Décor | $70.00 | | $70.00 |
| Rug | $50.00 | | $50.00 |
| | | | |
| Bathroom | | | |
| Nothing of Material Value | $0.00 | | |
| | | | |
| Basement | | | |
| Heater | $150.00 | | $150.00 |
| Chest Freezer | $250.00 | | $250.00 |
| Upright Freezer | $500.00 | | $500.00 |
| Fire Extinguisher | $100.00 | | $100.00 |
| | | | |
| **Subtotal** | **$4,945.00** | | **$3,695.00** |
| | | | |
| **Item** | **Jackson's Value** | **ILIT Testimony** | **Court's Finding** |
| Bar | | | |
| Icemaker - Scotsman | $1,800.00 | $250 (used) $1,775 (new) | $250.00 |
| Under counter double lighted bar fridge | $1,500.00 | $250-300 (used) $500 (new) | $300.00 |
| Bottle Cooler Fridge | $1,200.00 | $200 | $200.00 |
| TV – Sharp | $400.00 | | |
| 5 bar stools | $2,250.00 | 3 for $200 (used), $250 ea new in 2012 | $333.00 |
| "Sugar Hill Tavern" neon sign | $250.00 | | $250.00 |
| NDSU platter | $50.00 | | $50.00 |
| NDSU neon clock | $20.00 | | $20.00 |
| Misc. Décor | $50.00 | | $50.00 |
| Glass Hamm's Sign | $25.00 | | $25.00 |
| Rotary Phone | $75.00 | | $75.00 |
| Misc. Bar Stemware | $200.00 | | $200.00 |
| | | | |
| Kitchen | | | |
| Dishwasher - Moyer Diebel | $4,750.00 | $500-$4,758 (new) | $500.00 |
| Commercial Fridge | $2,400.00 | $250 (used), $700 (new in 2012) | $250.00 |
| Commercial Freezer - Saturn | $1,500.00 | $250 (used) | $250.00 |
| Commercial Stove with hood - Saturn (Brand ?) | $5,000.00 | $2,000 (used with bells & whistles) | $2,000.00 |
| Microwave - Saturn | $250.00 | | $250.00 |
| Cutlery Set | $100.00 | | $100.00 |

| | | | |
|---|---|---|---|
| Pizza Oven - Fusion | $170.00 | | $170.00 |
| Fire Extinguisher | $100.00 | | $100.00 |
| Ladder | $50.00 | | $50.00 |
| | | | |
| Men's 1/2 Bath | | | |
| Nothing of Material Value | $0.00 | | |
| | | | |
| Women's 1/2 Bath | | | |
| Nothing of Material Value | $0.00 | | |
| | | | |
| Recreation Room | | | |
| Bison Head | $5,000.00 | $2,500 purchase price | $2,500.00 |
| Hamm's Sign - inside | $250.00 | | $250.00 |
| Entry rug, Sisal with fabric edging 5x8? | $259.00 | | $259.00 |
| Olhausen Pool Table with cover - NDSU | $7,500.00 | $1,500-$2,000, cover $200 | $2,200.00 |
| Pool Sticks, Supplies & Rack | $500.00 | | $500.00 |
| Juke Box with riser | $0.00 | | $0.00 |
| 2 TV's - Sharp | $800.00 | | $800.00 |
| Maker's Mark Sign | $25.00 | | $25.00 |
| Bison Sign | $25.00 | | $25.00 |
| Red Leather Sofa & two club chairs | $4,900.00 | $500 couch, $150/chair (used) $7,000 new in 2010 | $800.00 |
| Coffee Table | $100.00 | | $100.00 |
| 2 side tables | $200.00 | | $200.00 |
| Stick lamp | $75.00 | | $75.00 |
| Fireplace pokers | $100.00 | | $100.00 |
| Dynamite box with starter logs | $50.00 | | $50.00 |
| Bison picture over mantle | $150.00 | | $150.00 |
| Misc. Décor | $80.00 | | $80.00 |
| Game Table & 6 Leather Chairs | $2,000.00 | Kept table, $50 ea chairs used | $300.00 |
| 2 Barrel Bar Tables with 8 Barrel Stools | $2,200.00 | $50 ea for stools | $400.00 |
| "Close to Paradise" Terry Redlin signed and numbered art 1396/9500 | $250.00 | | $250.00 |
| Art - Canoes on the water | $150.00 | | $150.00 |
| NDSU pennant | $6.00 | | $6.00 |
| | | | |
| Loft | | | |
| 2 Leather-like chairs | $300.00 | | $300.00 |
| 2 side tables | $200.00 | | $200.00 |
| 2 lamps | $150.00 | | $150.00 |

| Item | Jackson's Value | ILIT Testimony | Court's Finding |
|---|---|---|---|
| Leather-like sofa | $250.00 | | $250.00 |
| Leather recliner | $800.00 | | $800.00 |
| 1 Tree's painting | $100.00 | | $100.00 |
| 3 framed "Island Lake" pieces | $300.00 | | $300.00 |
| | | | |
| Work Room | | | |
| Ping Pong Tabletop - Olhausen | $400.00 | | $400.00 |
| Dyson upright vacuum | $500.00 | | $500.00 |
| | | | |
| Subtotal of all Property | $49,760.00 | | $17,643.00 |

| Item | Jackson's Value | ILIT Testimony | Court's Finding |
|---|---|---|---|
| Garage | | | |
| Jeep newer | $0.00 | | |
| Wagoneer old | $0.00 | | |
| Gator - John Deere | $0.00 | | |
| Boat with trailer | $0.00 | | |
| Basketball Hoop | $1,000.00 | $50, portable, plastic base, $500-$600 new | $50.00 |
| Maple Syrup Evaporator - Lender | $12,000.00 | $1,500 (used) - $4,000(new) | $1,500.00 |
| Ladder | $50.00 | | |
| 2 Large Outdoor chairs matching those at outdoor kitchen | $2,450.00 | Ex. W | $2,264.00 |
| copper topped Outdoor table matching those @ Outdoor kitchen | $600.00 | Ex. W | $470.00 |
| Cover for boat lift | $400.00 | | $400.00 |
| 2 Fire Extinguishers | $200.00 | | $200.00 |
| Small Metal Roll Table | $100.00 | | $100.00 |
| Large Metal Roll Table with vice (ULINE?) | $600.00 | | $600.00 |
| Outdoor Umbrella | $200.00 | | $200.00 |
| 6 black metal chairs for outdoor dining table | $300.00 | | $300.00 |
| Fridge | $0.00 | | $0.00 |
| Air Compressor - Craftsman (60 gal. ?) | $675.00 | | $675.00 |
| Shop vac | $50.00 | | $50.00 |
| Outdoor Bar Table and 4 Stools | $375.00 | | $375.00 |
| Dock Manual Lift | $150.00 | | $150.00 |
| 2 Bark Crescent Garden Eye Family Planters | $550.00 | | $550.00 |
| Water cooler | $100.00 | | $100.00 |
| Neon clock | $20.00 | | $20.00 |
| | | | |
| Tool Cabinets | | | |

| | | | |
|---|---|---|---|
| 4 double door cabinets (Ulti-MATE?) | $1,700.00 | $1600 (new), used value not offered | $1,600.00 |
| Weed eater - Stihl | $300.00 | | $300.00 |
| Leaf Blower - Stihl | $150.00 | | $150.00 |
| Chainsaw - DeWalt | $125.00 | | $125.00 |
| | | | |
| Bathroom | | | |
| Nothing of Material Value | $0.00 | | |
| | | | |
| Workroom | | | |
| Metal Trash Can | $50.00 | | $50.00 |
| Upright W/D | $1,250.00 | $150-$250 (used) $1,100 (new) | $200.00 |
| | | | |
| **Subtotal** | **$23,395.00** | | **$10,429.00** |

| Item | Jackson's Value | ILIT Testimony | Court's Finding |
|---|---|---|---|
| Water | | | |
| Boat Lift - Lift Tech Marine | $1,200.00 | $5,500 for this item & next two | $5,500.00 |
| Boat Lift bunk & frame | $1,800.00 | | included above |
| Dock System | $12,000.00 | | included above |
| Dock Bench | $300.00 | | $300.00 |
| 1 Flag pole with American Flag | $200.00 | | $200.00 |
| | | | |
| Outdoor Misc. | | | |
| TV Satellite @ Bar | $75.00 | | $75.00 |
| TV Satellite @ House | $75.00 | | $75.00 |
| "Sugar Hill Camp" metal sign@ entry | $250.00 | | $250.00 |
| Hamm's "Sugar Hill Tavern sign | $500.00 | | $500.00 |
| Grill @ Bar - Weber Genesis Silver | $700.00 | | $700.00 |
| Grill Charcoal @ House | $150.00 | | $150.00 |
| Grill Gas @ House - Weber Summit | $2,000.00 | $1,000-$1,300 (used), $2,100 (new) | $1,300.00 |
| Clock on Guest House | $100.00 | | $100.00 |
| Outdoor Dining Table @ House | $250.00 | | $250.00 |
| 2 large Outdoor chairs @ outdoor kitchen | $2,450.00 | Ex. W, Test: $150 ea used, $1200 ea (new) | $2,264.00 |
| Rocker Bench @ building | $100.00 | | $100.00 |
| Black metal bench @ outdoor bar | $100.00 | | $100.00 |
| Copper topped outdoor table | $600.00 | Ex. W | $470.00 |
| 1 wicker bench @ bar | $50.00 | | $50.00 |

| | | | |
|---|---|---|---|
| 3 Adirondack Chairs @ Bar | $495.00 | | $495.00 |
| Hammock | $50.00 | | $50.00 |
| 1 western-themed wood covered cooler | $50.00 | | $50.00 |
| Hose @ Guest House | $20.00 | | $20.00 |
| Hose @ Building | $20.00 | | $20.00 |
| 15-Pest Control Poison Boxes | $150.00 | | $150.00 |
| | | | |
| Subtotal | $23,685.00 | | $13,169.00 |